**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **IRONSHORE SPECIALTY<br>INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:23-cv-358 (MTT)** |
| | ) | |
| **ALPHONZO LOGAN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**ORDER**</u>

Plaintiff Ironshore Specialty Insurance Company ("Ironshore") filed this declaratory judgment action against defendants Alphonzo Logan, Dewayne Logan, Jamaar Dewayne Logan as Executor of the Estate of Mary Francis Logan ("the Logans"), and 4 West Holdings, Inc. ("4 West").[1] ECF 1. Shortly after Ironshore filed its complaint, the Logans filed a garnishment action in state court against Ironshore, which has now been consolidated with the declaratory judgment action. ECF 50.

Both parties have moved for summary judgment on all of Ironshore's claims. ECF 66; 70. The Logans have also moved for summary judgment in their garnishment action. ECF 70 at 1. For the following reasons, Ironshore's motion for summary judgment (ECF 66) is **GRANTED.** The Logans' motion for summary judgment (ECF 70) is **DENIED.**

---

[1] 4 West is in default. *See* ECF 23.

# I. BACKGROUND[2]

This case involves a judgment the Logans obtained on a tort claim against Ironshore's insured. ECF 70-2 ¶ 54; 76-1 ¶ 54; 76-15. After the insured filed bankruptcy, the Logans executed a general release of the insured in exchange for a payment from a "Tort Claimants Trust" created by the insured's bankruptcy court-approved liquidation plan. ECF 66-19; 76-2. Although a general release, the release purported to preserve claims against the insured's insurance carriers. 76-2 at 2. With the bankruptcy stay lifted, the Logans, under unusual circumstances, then got their judgment. ECF 76-15. Ironshore claims the release relieved it of any duty to pay the judgment. ECF 76 at 6.

## A. The Policy

"Ironshore issued [a] Long Term Care Organizations Professional Liability, General Liability and Employee Benefits Liability Insurance Policy to 4 West for the December 29, 2014 to December 29, 2015 policy period." ECF 66-1 ¶ 1; 77-1 ¶ 1 (emphasis removed). Covenant Dove Healthcare of Macon, later known as Macon Rehabilitation and Healthcare Center LLC ("Macon Rehab"), was a named insured under the policy. ECF 1-1 at 33; 66-1 ¶ 3; 77-1 ¶ 3.

The policy provides, "[t]he Insurer will pay on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim**[.]" ECF 1-1 at 6 (emphasis in original); 66-1 ¶ 5; 77-1 ¶ 5. "Loss" is defined as "damages, settlements, judgments or other amounts … in excess of the applicable Retention … and not exceeding the applicable Limit of Liability." ECF 1-1 at 10-11; 66-1 ¶ 9; 77-1 ¶ 9.

---

[2] Unless otherwise stated, these facts are undisputed.

"**Claim**" is defined as "a written demand received by an **Insured** for monetary damages resulting from a **Wrongful Act** or an **Occurrence**." *Id*. at 8.

The policy was subject to a self-insured retention of $500,000. ECF 66-1 ¶ 6; 77-1 ¶ 6. Thus, the insured was responsible for any loss, including defense costs, within the self-insured retention. ECF 1-1 at 21; 66-1 ¶ 10; 77-1 ¶ 10. Ironshore's obligation was limited to losses or defense expenses in excess of $500,000, assuming, of course, the policy otherwise covered the loss. *Id*.

Under the policy, "[n]o Insured shall, except at its own cost, incur any expense, make any payment, or settle any **Claim** without the Insurer's written consent." ECF 1-1 at 22;66-1 ¶ 49; 77-1 ¶ 49. Further, "the Insured shall provide the Insurer with all information, assistance and cooperation that the insurer reasonably requests." ECF 1-1 at 24.

Finally, the policy provides "[t]he Insurer will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any **Insured** or his/her/its estate." ECF 1-1 at 26.

## B. The Underlying Lawsuit

Mary Francis Logan was a resident of Macon Rehab, a long-term care facility. ECF 66-1 ¶ 11; 77-1 ¶ 11. In October 2014, Mary Francis fractured her hip "when a facility employee was moving her to the shower." ECF 66-1 ¶ 12; 77-1 ¶ 12. "On April 28, 2015, counsel for the Logans wrote [to Macon Rehab] stating that it 'may be liable to Ms. Logan for her personal injury,' and requested disclosure of the relevant insurance policies." ECF 66-1 ¶ 13; 66-7 at 2; 77-1 ¶ 13. "After the potential claim was reported to Ironshore, Ironshore'[s] third-party-administrator—Hamlin & Burton—acknowledged

receipt of the notice, assigned defense counsel, and issued a reservation of rights letter." ECF 66-1 ¶ 14; 77-1 ¶ 14. Hall Booth Smith, P.C., was assigned as defense counsel for Macon Rehab. ECF 70-2 ¶ 17; 76-1 ¶ 17. Hall Booth Smith "was directed to submit its invoices to the insured's third-party administrator—HC Navigator—until the insured's $500,000 retention was exhausted." ECF 66-1 ¶ 15; 77-1 ¶ 15. In 2016, Alphonzo Logan, Dewayne Logan, and Jamaar Dewayne Logan—Mary Francis' children—"filed a personal injury lawsuit against Macon Rehab in [] Bibb County, Georgia."[3] ECF 66-1 ¶ 16; 77-1 ¶ 16.

## C. The Bankruptcy Proceedings

On March 6, 2018, while the underlying action was pending, 4 West and several of its affiliated entities, including Macon Rehab, filed a voluntary Chapter 11 bankruptcy petition. ECF 66-1 ¶ 20; 77-1 ¶ 20. On March 14, 2018, the State Court action was stayed pending the resolution of the bankruptcy proceedings. ECF 70-2 ¶ 21; 76-1 ¶ 21.

On June 22, 2018, the debtors filed their Third Amended Joint Plan of Reorganization (the "Third Plan") in the bankruptcy action.  ECF 70-2 ¶ 30; 76-1 ¶ 30; 76-7 at 134; *In re 4 West Holdings, Inc.*, No. 18-30777 (N.D. Tex. Nov. 4, 2022), ECF 616. The Third Plan was confirmed and became effective on February 13, 2019. ECF 70-19 at 45. The Third Plan was a liquidating plan that allowed a "Plan Sponsor" to purchase the debtors' assets and use the proceeds of the sale to fund distributions to some holders of claims against the debtors, including tort claimants such as the Logans. ECF 70-13 at 4, 76, 78, 79, 94. To settle the debtors' tort liabilities, the Third Plan created a $2,000,000 Tort Claimants Trust that was "funded, in cash, by the Plan

---

[3] Mary Francis died in 2016. ECF 1 ¶ 29; 18 ¶ 29.

Sponsor." *Id.* at 79, 96. According to the Third Plan, the "sole purpose" of the Tort Claimants Trust was to "liquidat[e] and distribut[e] the Tort Claims Cash Amount." *Id.* at 94. The Third Plan provided that tort claimants would receive a payment from the Tort Claimants Trust in exchange for "full satisfaction, settlement, discharge, and release" of their claims against the debtors. *Id.* at 32, 86. On July 31, 2019, counsel for the Tort Claimants Trustee offered the Logans $4,000 in exchange for "full and final settlement" of the Logans' claim. ECF 66-19 at 2. On March 20, 2020, presumably after negotiations, the Logans signed a general release in exchange for $5,000. ECF 49-1; 66-6. There is no evidence that Ironshore consented, in writing or otherwise, to the settlement. The Third Plan and the March 2020 release signed by the Logans are discussed in more detail below.

**D. The Post-Bankruptcy State Court Proceedings**

Beth Diemer, Ironshore's claims officer, "received [a copy of] the Release in October 2020 and then closed Ironshore's file regarding the Logan matter." ECF 66-12 ¶ 4; 85-1. However, the Logans continued to pursue their claim against Macon Rehab in the Bibb County State Court. Although they had settled with Macon Rehab, the Logans planned to reduce their claim to judgment and then file a direct action against Ironshore to collect the judgment. On October 28, 2020, the Logans' counsel emailed the State Court to request a trial setting. ECF 70-2 ¶ 47; 70-24 at 2; 76-1 ¶ 47. A Hall Booth Smith lawyer was copied on that email. *Id.* However, the Logans' counsel did not copy Diemer or any other Ironshore representative on the email. ECF 70-24 at 2.

On June 23, 2021, Macon Rehab's defense counsel moved to withdraw from the State Court Action. ECF 70-2 ¶ 49; 76-1 ¶ 49. As grounds for withdrawal, Macon

Rehab's attorney stated, "he and his firm, Hall Booth Smith, P.C. [were] no longer being compensated for their services."[4] ECF 70-21 ¶ 1. On July 13, 2021, the State Court granted Hall Booth Smith's motion to withdraw. ECF 70-25 at 2.

On February 22, 2023, the State Court sent a notice of a non-jury trial to the Logans' attorney and to Macon Rehab. ECF 70-26 at 2. The Logans did not notify Ironshore of the trial setting. Trial was held on March 29, 2023. ECF 66-9 at 2. Macon Rehab did not appear. *Id*. Consequently, the State Court granted the Logans' motion to strike Macon Rehab's answer and deemed liability admitted. *Id*. at 4. After a trial on damages, the State Court entered judgment for the Logans in the amount of $2,100,000, plus court costs and interest. *Id*. On May 22, 2023, counsel for the Logans emailed Ironshore demanding payment of $1,100,000 of the State Court judgment.[5] ECF 66-15 at 2.

### E. Ironshore's Declaratory Judgment Action and the Logans' Garnishment Action

On September 18, 2023, Ironshore filed this action seeking a declaration that it has no obligation to pay the Logans' judgment. ECF 1. Ironshore asserts four theories; only one requires discussion. *Id*. In Count I, Ironshore claims there is no coverage under the policy because "the Logans fully released and discharged the insureds from any liability." *Id*. ¶ 6. Therefore, the judgment is not a "Loss that the Insured is legally obligated to pay."[6] ECF 1-1 at 6 (emphasis removed); 66-1 ¶ 5; 77-1 ¶ 5.

---

[4] Recall that the insured was responsible for legal expenses until the exhaustion of the insured's self-insured retention.

[5] In the letter, the Logans asked only for the amount of the judgment that exceeded Macon Rehab's self-insured retention. ECF 66-15 at 2.

[6] Count II alleges the default judgment is a sanction not covered by the policy. ECF 1 ¶¶ 45-48. Counts III and IV allege Macon Rehab and the Logans breached policy conditions, specifically the Logans settled with Macon Rehab without Ironshore's written consent, and they failed to cooperate with Ironshore when

In their answer to Ironshore's complaint, the Logans admitted that the general release "discharged all claims against 4 West and Macon Rehab." *Id.* ¶¶ 32, 43; 18 ¶¶ 32, 43. However, the Logans denied that the judgment, though obtained after Macon Rehab had been released from liability, was not a loss that the insured was obligated to pay. ECF 1 ¶ 44; 18 ¶ 32.

On October 6, 2023, the Logans filed their garnishment action in the State Court of Gwinnett County against Macon Rehab, Ironshore Specialty Insurance Company, Ironshore Insurance Services, LLC, and Ironshore Indemnity, Inc. *Logan v. Macon Rehabilitation and Healthcare Center, LLC*, No. 5:24-cv-57 (M.D. Ga Nov. 22, 2023), ECF 1 at 2. Ironshore removed the action to the Northern District of Georgia on November 22, 2023, and the action was transferred to this Court on February 14, 2024. *Id.* On March 27, 2024, the garnishment action was stayed pending the resolution of the declaratory action. *Id.* at ECF 27. The two actions were consolidated on August 1, 2024. ECF 50.

On January 24, 2024, the Logans, without the benefit of discovery, moved for summary judgment on all of Ironshore's claims. ECF 28; 28-1. On January 29, 2024, Ironshore countered with a motion for judgment on the pleadings, arguing that the Logans had no right to coverage as a matter of law. ECF 32; 32-1. On August 2, 2024, the Court denied the Logans' motion for summary judgment. ECF 51 at 14. Because of the vagueness of the pleadings and the record regarding the possible impact of the

---

they proceeded to trial without notice to Ironshore. *Id.* ¶¶ 49-59. The Logans, as judgment creditors "derive[] [their] rights under the policy through the insured, ... and [are] entitled to recover under the policy only if it appears that all conditions precedent have been complied with." *Commercial Union Ins. Co. v. Bradley Co.*, 186 Ga. App. 610, 612-13, 367 S.E.2d 820, 823 (1988) (quoting *Wolverine Inx. Co. v. Sorrough*, 122 Ga. App. 556, 57-58, 117 S.E.2d 819, 820 (1970)). All three counts have merit, particularly Count IV, but the Court does not reach them.

bankruptcy proceedings, the Court converted Ironshore's motion to a motion for summary judgment and convened a hearing to address its concerns. *Id.* The Court denied Ironshore's motion without prejudice and ordered the parties to do some discovery. ECF 54 at 15:6-12.

Discovery is now complete, and both parties have moved for summary judgment on all of Ironshore's claims. ECF 66; 70. The Court held a motion hearing on July 31, 2025. ECF 88. At the hearing, the Court ordered both parties to file supplemental briefing on the effect of the bankruptcy proceedings. ECF 88; 89.

## II. STANDARD AND GOVERNING LAW

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Info. Sys. & Networks Corp.*, 281 F.3d at 1224. The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id*.

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id*. (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. Thus, the Court "can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material

*negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (cleaned up). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Cartrett*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). The Court will consider each motion on its own merits, and will view the facts "in the light most favorable to the non-moving party on each motion." *Am. Bankers Ins. Grp.*, 408 F.3d at 1331; *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).

The parties agree that Georgia law governs the policy and Texas law governs the release. ECF 32-1 at 13-17; 36 at 5. Under Georgia law, the insured has the burden to prove that it suffered a loss covered by the policy, that it complied with the policy's conditions precedent, and that the insurer waived its right to raise a relevant policy defense. *Rsrv. Life Ins. Co. v. Davis*, 224 Ga. 665, 667, 164 S.E.2d 132, 133 (1968); *Wolverine Ins. Co. v. Sorrough*, 122 Ga. App. 556, 560, 177 S.E.2d 819, 822 (1970);

*Metropolitan Life Ins. Co. v. Smith*, 48 Ga. App. 245, 247, 172 S.E. 654, 656 (1934); *see also* 17A Steven Plitt et. al., *Couch on Insurance* § 254:11 (3d ed. 2022). However, the insurer bears the burden of proving that a policy exclusion, exception, or other affirmative defense applies. *Rsrv. Life Ins. Co. v. Ayers*, 217 Ga. 206, 213, 121 S.E.2d 649, 654 (1961); *see also* 17A Steven Plitt et. al., *Couch on Insurance* § 254:12 (3d ed. 2022).

Thus, at trial the Logans would have the burden to prove that their claim is a "Loss" as defined by the policy. However, for clarity and ease of discussion, and because the facts are undisputed and the law is clear, the Court proceeds under the assumption that Ironshore as movant has the burden of proof on all issues.

### III. DISCUSSION

**A. Coverage Under the Policy**

Ironshore contends that because its policy covers only losses "that the **Insured** is legally obligated to pay," it has no obligation to pay the judgment obtained by the Logans after Macon Rehab was released from liability. ECF 1 ¶¶ 40-44 (emphasis in original); 66-2 at 16-20. The Logans admit the release discharged Macon Rehab's tort liability but contend the release preserved their ability to recover the underlying judgment against Ironshore. ECF 1 ¶ 32, 43; 18 ¶ 32, 43; 70-1 at 14; 91 at 4.  The Logans do not argue that the debtors received a discharge under the Bankruptcy Code. *See* ECF 70-1 at 15 ("Of course, in the Chapter 11 case at issue here the Debtors did <u>not</u> even receive a discharge.") (emphasis in original).

In its August 2024 order on the parties' initial cross motions, the Court tentatively agreed that because the Logans had settled their claim and released Macon Rehab

from all liability, their loss was not covered by the Ironshore policy. ECF 51. The Court reasoned that the judgment was not a "Loss" as defined by the policy because the general release relieved Macon Rehab of any obligation to pay the subsequent state court judgment. *Id.* at 11-12; *see Pool v. Durish*, 848 S.W.2d 722, 723 (Tex. App. 1992) ("[A]s a general rule a party who releases an insured from liability retains no cause of action against the insurer.")[7]; *Riley v. Champion Int. Corp.*, 973 F. Supp. 634, 649 (E.D. Tex. 1997) ("[A] release extinguishes a claim or cause of action as would a prior judgment and is an absolute bar to any suit on the released matter."). This was true, the Court explained, regardless of the language in the release purporting to preserve any claims against Macon Rehab's insurers because "[t]he Logans cannot use this 'carve out' to create coverage where none exists." ECF 51 at 12.

At that time, the Logans advanced no meaningful analysis of any action by the bankruptcy court that would explain why this straightforward, black-letter principle of insurance and contract law did not bar their collection efforts. *See* ECF 51 at 13. When it allowed the parties to develop the record, the Court thought they would provide that analysis. They did not. Indeed, the Logans' position scarcely changed. *Compare* ECF 28-1 at 2-8 *with* ECF 70-1 at 13-15. Nor has the Court's initial conclusion—because the Logans released Macon Rehab from liability, their judgment is not a "**loss** that the **Insured** is legally obligated to pay." ECF 1-1 at 6 (emphasis in original). The Court

---

[7] In their previous briefs, the Logans argued that *Pool* is distinguishable because it concerned an excess insurer while here, Ironshore abandoned its insured. As the Court concluded in its August 2024 Order, any alleged abandonment by Ironshore is irrelevant because "Ironshore's obligation to pay under the policy is dependent on whether 4 West has a legal obligation to pay the State Court judgment." ECF 51 at 11. In any event, there was no abandonment. Because of its substantial self-insured retention, Macon Rehab was defending itself and funding that defense. Macon Rehab chose to settle the Logans' claim and, consequently, to stop paying its defense attorney. Ironshore learned of the settlement and closed its file.

could stop there. But the Court, unlike the parties, has taken a closer look at what happened in the bankruptcy court.

The confirmation order and the Third Plan provided for the distribution of funds to holders of various claims against the Debtors. Unlike earlier versions, the Third Plan separated unsecured claims into two categories: (1) "Class 4 General Unsecured Claims," and (2) "Class 4.A Tort Claims." ECF 70-2 ¶ 30; 70-13 at 85-86; 76-1 ¶ 30. The Logans' tort claim was a Class 4.A Tort Claim. ECF 66-19 at 2; 70-2 ¶ 45; 70-22; 76-1 ¶ 45.

The holders of tort claims could "opt out" of the Third Plan's release provisions. ECF 70-13 at 51, 74. Unlike the other claimants, an "opt out" claimant was not subject to the Third Plan's third-party release provisions. *Id.* at 74. Thus, opt-out claimants were free to pursue claims against the debtors and their insurers.[8] ECF 70-13 at 51, 74. Claimants who did not opt out had to liquidate their claims according to the Third Plan's distribution and release provisions.

The Third Plan established a "Tort Claimants Trust" and appointed a "Tort Claimants Trustee" to oversee distributions. ECF 70-2 ¶ 30; 76-1 ¶ 30. Under the Third Plan, the Tort Claimants Trust was funded by the Plan Sponsor and the Purchaser.[9] ECF 70-13 at 28. The Third Plan provided that "the Holder of such Allowed Class 4.A Tort Claim shall receive in full satisfaction, settlement, and release of, and in exchange

---

[8] There is no evidence the Logans ever attempted to opt out of the Third Plan's release provisions.

[9] Under the Third Plan, "SC-GA 2019 Partners, LLC (or its designee(s))" was both the Plan Sponsor and the Purchaser. ECF 70-13 at 76, 77.

for, such Allowed Class 4.A Tort Claim, its Pro Rata share of the Tort Claims Cash amount."[10] *Id.* at 86.

For a Tort Claim to become an Allowed Class 4.A Tort Claim, the following steps were required to be completed:

> The Debtors or Tort Claimants Trust must submit to the holder of a Tort Claim: "(i) a request for additional documentation to be provided to evidence such [a] claim or (ii) submit a settlement offer for an Allowed Tort Claim to such holder."
>
> "[T]he holder of such Tort Claim may accept the settlement offer within 30 days." If the settlement offer is rejected, "the claimant and the Debtors or the Tort Claimants Trust may confer and negotiate in good faith in an attempt to agree upon an Allowed Tort Claim amount."
>
> "[I]f no settlement is reached…the Debtors or the Tort Claimants Trust and the claimant may agree to (i) participate in a nonbinding mediation process…;(ii) submit the Claim to binding arbitration…; or (iii) file a motion to withdraw the reference…and thereafter to disallow, liquidate or estimate such Claim in the United States District Court."

*Id.* at 50. Once the tort claimants received the settlement proceeds, the Debtor received a "discharge and release of" liability.[11] *Id.* at 86, 112.

The Third Plan and confirmation order addressed insurers. *Id.* at 50, 100. First, the confirmation order contained a "tort claims provision," which provided:

> Nothing contained in the Plan, Disclosure Statement, or this Order, shall release or otherwise discharge any Insurer of the Debtors under the Insurance Policies, or otherwise enjoin, stay or otherwise prohibit any

---

[10] It is not clear what "pro rata share" means. The Third Plan contemplated a negotiation process, and that is what happened when the Logans settled their claim.

[11] Again, the "discharge" under the Third Plan is not a discharge under the Bankruptcy Code. 11 U.S.C. § 1141 governs discharges of Chapter 11 reorganization plans. Under § 1141(d)(3) the confirmation of a bankruptcy plan does not discharge a debtor if – "(A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (c) the debtor would be denied under section 727(a) of this title if the case were a case under chapter 7 under this title." Under 11 U.S.C. § 727(a), "the court shall grant the debtor a discharge, unless – (1) the debtor is not an individual." Here, the Third Plan was a liquidating plan, Macon Rehab did not engage in business after the consummation of the Third Plan, and Macon Rehab was not an individual. Thus, Macon Rehab did not receive a discharge under Bankruptcy Code. *See* ECF 70-13 at 51 ("[T]he Debtors are not entitled to a discharge under section 1141(d)(3) of the Bankruptcy Code.")

> holder of a Tort Claim from asserting any such claim against an Insurer;
> provided, however, that with respect to all such claims, any litigation may
> proceed against a Debtor only as a nominal party and **only to the extent
> of any liability covered by any such Insurance Policy,** and the
> automatic stay under 11 U.S.C. § 362 of the Bankruptcy Code shall
> terminate on the Effective Date for such limited purpose as set forth
> herein.

*Id.* at 50-51. (emphasis added).

Article V of the Third Plan also contained the following "insurance non-

impairment provision":

> Notwithstanding anything contained in the Plan or the Confirmation Order
> to the contrary, unless specifically rejected by order of the Bankruptcy
> Court or under the Plan, **all Insurance Policies shall be assumed under
> the Plan as executory contracts, and nothing in the Plan or the
> Confirmation Order shall alter the rights and obligations of the
> Debtors or the insurers under the Insurance Policies** (which rights and
> obligations shall be determined under the applicable Insurance Policies
> and applicable nonbankruptcy law relating thereto) **or modify the
> coverage thereunder, and all of the Insurance Policies shall continue
> in full force and effect according to their terms and conditions**;
> provided, however, in the event the underlying claim arose before the
> Petition Date, the Reorganized Debtors shall have no obligation to fund
> any self-insured retention.

*Id.* at 101 (emphasis added).

On July 31, 2019, Dante Skourellos, counsel for the Tort Claimants Trustee, sent

the Logans' attorney a letter offering the Logans' $4,000 for "full and final settlement of

[the Logans'] claim." ECF 66-19 at 2. The letter included a hyperlink to a copy of the

confirmation order and the Third plan. *Id.* According to Skourellos, the Logans would "be

required to execute a General Release" for the Tort Claimants Trust payment. *Id.*

On February 25, 2020, after the parties negotiated a settlement of $5,000,

Skourellos' office manager sent a copy of the release to the Logans' counsel for review

and signature. ECF 66-18 at 2. She also provided the Logans' counsel with the contact

information of Diemer, Ironshore's representative. *Id.*

On March 20, 2020, the Logans executed the release, which released the debtors, specifically Macon Rehab, from all liability. ECF 70-2 ¶ 45; 76-1 ¶ 45. The release provided:

> **It is further understood and agreed that this release does not, and is not intended to, release or discharge any claim or potential claim against any other person or entity not identified herein, including, but not limited to, any insurer of the Debtors under the insurance policies,** any other nursing home, any surgeon or doctor, or their professional association, nurses, or independent contractors, any therapy company or pharmaceutical company, consultants, or any hospital except those specifically provided herein.

ECF 66-6 at 3 (emphasis added).

In sum, the bankruptcy proceeding ultimately resulted in the sale of the debtors' assets, followed by their liquidation. However, and for whatever reason, the parties (likely the purchaser in an effort to preclude claims against the assets) wanted to extinguish tort liabilities to the extent possible. Hence, the funding of the Tort Claimants' Trust and the negotiation of settlements of those claims. The Logans chose to settle their claims. They didn't have to. They could have opted out and pursued their claims against Macon Rehab. Of course, at that point, Macon Rehab likely would have been insolvent. But that is the ultimate point. The insolvency of the insured might not have relieved Ironshore of its duty to indemnify Macon Rehab for an otherwise covered loss.[12] The Logans' settlement with Macon Rehab is quite another matter.

---

[12] If, rather than settling with Macon Rehab, the Logans had opted out and pursued their claims against an insolvent Macon Rehab, they perhaps could have relied on the policy's bankruptcy or insolvency of the insured provision. *See* ECF 1-1 at 26 ("The Insurer will not be relieved of its obligations under this Policy by the bankruptcy or insolvency of any **Insured** or his/her/its estate." (emphasis in original)).

As the Logans admitted in their answer, it was the general release that "discharged all claims against 4 West and Macon Rehab." ECF 1 ¶¶ 32, 43; ECF 18 ¶¶ 32, 43. Upon execution of that release, Macon Rehab was no longer legally obligated to pay the post-bankruptcy judgment. Thus, that judgment cannot be considered a loss under the policy. *See Pool*, 848 at 723 ("[T]he insurance policy does not bind the insurer for primary liability to an injured party, but its liability is contractual … it contemplates that the insured must be liable to the injured person … before the insurer can be held liable.") (citation modified)); *Empire Indem. Ins. Co. v. N/S Corp.*, 571 F. App'x 344, 348 (5th Cir. 2014) ("Once [the insured] was released, the subsequently-entered judgment was 'merely a fiction and had no legal effect,' because the claim, judgment, and liability had already been extinguished.") (citation modified)).

At the July 2025 hearing, the Logans advanced a new argument—Macon Rehab's legal obligation to the Logans was "never extinguished" by the general release *or* the Third Plan. ECF 89 at 42:24-43:12, 47:5-22. Rather, under this new argument, the Third Plan only "limited the remedies of" tort claimants to distributions from the Tort Claimants Trust. *Id.* at 49:17-23. And, the Logans argued, the general release did not release Macon Rehab's liability because it was merely an "ancillary document that[] [was] part of effectuating" the Third Plan. *Id.* at 50:7-21. Therefore, the Logans contended, because Macon Rehab was never released from liability, any judgment against Macon Rehab is a loss under the policy. *Id.* This argument fails.

First, the Logans admitted in their answer that the release "fully released and discharged any claims against the insured[]." ECF 1 ¶ 43; 18 ¶ 43. They are bound by that admission. Second, the Court is not sure what the Logans mean by "ancillary," but

the release speaks for itself. "Under Texas law, a release is a contract and is subject to the rules governing contract construction." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of North America*, 955 S.W.2d 120, 127 (Tex. Ct. App. 1997). When interpreting a contract, "the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Id.* (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). "The intention of the parties is discovered primarily by reference to the words used in the contract." *Id.* Here, the release explicitly states the Logans "hereby remise, release, acquit, satisfy and forever discharge 4 West Holdings, Inc., [and] Macon Rehabilitation and Healthcare Center, LLC …." ECF 76-2 at 2.[13]

Then, in their post-hearing brief, the Logans changed tack even more dramatically and argued that the confirmation of the Third Plan, not the release, extinguished "any further obligations of the Debtors with respect to Tort Claims." ECF 91 at 4-5. Notwithstanding their release of Macon Rehab, they argued the Third Plan granted tort claimants the right to pursue claims against the debtors' insurers by obtaining judgment against the debtors as nominal parties. *Id.* at 4-5. As support, the Logans cite the Third Plan's tort claims provision, which provides, "[n]othing contained in the Plan, Disclosure Statement, or this Order, shall release or otherwise discharge any Insurer of the Debtors under the Insurance Policies." ECF 70-13 at 50. That last-gasp argument also fails.

First, of course, the Logans are still bound by their admission that the release "fully released and discharged any claims against the insured." ECF 1 ¶ 43; 18 ¶ 43.

---

[13] Certainly, the release was consistent with the goal of the asset purchase contemplated by the Third Plan—the tort liability of Macon Rehab would be extinguished.

Second, the Logans never explain how the Third Plan extinguished Macon Rehab's tort liability.

Third, the Logans omit critical language from the tort claims provision they rely on. That provision allowed tort claimants to pursue claims against a debtor as a nominal party "only to the extent covered by any such insurance policy." ECF 70-13 at 50. Because the Logans released Macon Rehab, Macon Rehab is not legally obligated to pay the judgment, and the judgment is not a covered loss. Clearly, the tort claims provision did not preserve coverage for losses not covered by the policy.

Fourth, the general acknowledgement that the Third Plan was not intended to relieve insurers of their obligations cannot be read to bless a scheme that allows a tort claimant to negotiate a full settlement of a tort claim without the insurer's consent and still force the insurer to pay a judgment obtained against the insured without the insurer's knowledge. In fact, the Third Plan emphatically says there is no such blessing. The Third Plan's insurance non-impairment provision makes clear "all Insurance Policies shall be assumed under the Plan as executory contracts, and nothing in the Plan or the Confirmation Order shall alter the rights and obligations of the Debtors or the insurers under the Insurance Policies." ECF 70-13 at 101. Thus, if the Logans' judgment against Macon Rehab is not covered under the policy, "nothing contained in the plan or the Confirmation Order" can expand Ironshore's obligation to pay or Macon Rehab's right to coverage under the policy.[14]  To hold that Macon Rehab was entitled to

---

[14] There are policies that allow, typically by statutory mandate, a claimant to pursue a direct action against an insurer without first obtaining a judgment establishing the liability of the insured. For example, until recently, Georgia allowed an individual injured by a motor carrier to file a direct action against the motor carrier's insurer without first establishing the motor carrier's liability.  *See* O.C.G.A. § 40-2-140(d)(4) (2009), *amended by* O.C.G.A. § 40-2-140(d)(4) (2024). Under the new law, an injured party can still file a prejudgment direct action if the motor carrier is insolvent or bankrupt or if service cannot be perfected

coverage after its legal obligations to the Logans were extinguished would alter both Macon Rehab's rights and Ironshore's obligations under the policy and is, therefore, inconsistent with the Third Plan.[15]  *See in re Boy Scouts of America*, 137 F.4th 126, 164 (3rd Cir. 2025) ("Insurance policies are property of the estate, and bankruptcy law—save for exceptions not relevant here—does not alter rights under those contracts.").

Accordingly, the Court concludes that the March 2020 release relieved Macon Rehab of any legal obligation to the Logans and, thus, the May 2023 judgment is not a loss covered by the policy.

**B. Waiver**

The Logans make two "waiver" arguments. First, the Logans contend that Ironshore waived its claims by failing to object to the Third Plan in the Bankruptcy Court. ECF 70-1 at 19-22. What the Logans really argue, it seems, is that the Bankruptcy Court's confirmation order and plan have preclusive effect and, thus, Ironshore cannot now challenge the terms of the Third Plan. *Id.* at 19-22.

The Logans' waiver arguments assume that the Third Plan somehow granted the Logans the ability to release Macon Rehab and, contrary to Ironshore's policy, to collect a subsequent judgment from Ironshore. As discussed, the Third Plan did not do that.

---

against the motor carrier or its driver. O.C.G.A. § 40-2-140(d)(4). The point is that there are reasons why the Third Plan made clear that the Plan did not "alter the rights and obligations" of insurers.

[15] The Logans also argue that the Confirmation Order and the Third Plan preempt any state law that would nullify rights under the Third Plan. ECF 70-1 at 17-19; 81 at 8. The Logans argue that 11 U.S.C. § 1123(a)(5) and the Third Plan's tort claims provision preempts state law governing releases. ECF 81 at 8-9. There is a "strong presumption against inferring Congressional preemption," which may only be overcome when "a congressional purpose to preempt is … clear and manifest." *In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 365 (3d Cir. 2012) (citation modified). The Logans cite no authority in which bankruptcy law has preempted state law governing releases of claims. Nor do the Logans provide any evidence of a clear and manifest congressional intent to preempt such state law.

Thus, even if Ironshore had known of the Third Plan, there was no reason for Ironshore to object to the confirmation of the Plan.

But assuming Ironshore had a reason and had standing[16] to object in the bankruptcy proceedings, the Bankruptcy Court's confirmation of the Third Plan does not preclude Ironshore from challenging the Logans' interpretation of the Third Plan. Like other judgments, "a confirmation order satisfies 'the requirements of a judgment that can be given [preclusive effect.]'" *In re Optical Techs., Inc.*, 425 F.3d 1294, 1300 (11th Cir. 2005) (quoting *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990)). There are four requirements of claim preclusion:

> First, the prior judgment must be valid in that it was rendered by a court of competent jurisdiction and in accordance with the requirements of due process. Second, the judgment must be final and on the merits. Third, there must be identity of both parties or their privies. Fourth, the later proceeding must involve the same cause of action as involved in the earlier proceeding.

*Id.* at 1300-01 (quoting *Justice Oaks*, 898 F.2d at 1550.)."

In *In re Optical*, when faced with a similar res judicata question, the Eleventh Circuit clarified that the appellants "[could] not raise objections to the actual terms of the [bankruptcy plan] or the confirmation order, as these were deemed waived when they failed to object to confirmation." *Id.* at 1301. However, the Eleventh Circuit explained that the appellants' arguments about "interpretation of the plan" were not res judicata arguments. *Id.* Here, Ironshore does not assert that the Bankruptcy Court had no authority to confirm the Third Plan—Ironshore simply argues the Third Plan does not have the effect that the Logans say it does. *E.g.*, ECF 76 at 15-18. The Logans provide

---

[16] *See In re Kaiser Gypsum Co., Inc.*, 60 F.4th 73, 83-88 (4th Cir. 2023), *reversed by Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 283 (2024).

no evidence that the Bankruptcy Court ever addressed that issue. Clearly, Ironshore has not "waived" any right to disagree with the Logans' interpretation of the Third Plan.

Second, the Logans argue, for the first time in their reply brief,[17] that Macon Rehab waived its right to assert its release as a defense and, thus, Ironshore too has waived the right to assert that argument before this Court. ECF 81 at 4. In other words, because Macon Rehab, which, according to the Logans, was only a nominal party, did not raise its release as a defense to the Logans' tort claim, Ironshore cannot argue in this declaratory judgment action that the judgment is not a loss and thus is not covered. *Id.* The Logans mistake an apple for an orange. Macon Rehab's right to assert a release defense if the Logans attempted to collect from Macon Rehab more than $5,000, has nothing to do with Ironshore's claim that the judgment is not a loss covered by the policy. In any event, the Logans cite no authority, and the Court has found none, limiting an insurer's claims in a declaratory judgment action to defenses raised by its *insured* in an underlying action. That argument fails.

## C. Consideration

Finally, and also for the first time in their reply brief, the Logans argue their release is unenforceable for lack of consideration. ECF 81 at 4-5. The Logans argue "[t]he Tort Claimants Trustee had no right or authority to condition any distribution from the Tort Claimants Trust to Defendants on a 'release' of claims against Macon Rehab, which was not to receive a discharge under the plan." *Id.* But the Third Plan provided for a release of tort claims against the debtor in exchange for Tort Claimants Trust

---

[17] "In general, a court should not consider [arguments] raised for the first time in a reply brief." *Reliance Ins. Co. of Illinois, Inc. v. Richfield Hospitality Servs.*, 92 F. Supp. 2d 1329, 1332 (N.D. Ga 2000); *see Reichmann v. Fla. Dep't of Corr.*, 940 F.3d 559, 579 (11th Cir. 2019).

distributions. ECF 70-13 at 86, 112. The Logans could have opted out of that provision, but they did not. *Id.* at 51, 74. The Logans point to nothing in the Third Plan, nothing in the Confirmation Order, and no other authority, that prevented the Tort Claimants Trustee from obtaining a general release in exchange for a payment from the Tort Claimants Trust. On the contrary, the general release is consistent with the Third Plan's third-party release provision. See ECF 70-13 at 109-111. Thus, the Logans have not demonstrated that the release is unenforceable for lack of consideration.

## IV. CONCLUSION[18]

Ironshore's motion for summary judgment (ECF 66) is **GRANTED**. The Logans' motion for summary judgment (ECF 70) is **DENIED**.

**SO ORDERED**, this 12th day of February, 2026.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[18] This ruling necessarily resolves the Logans' garnishment action, and that action is **DISMISSED**.